(112 So. 372)

No. 28468.

## STATE v. ROSETTE.

March 28, 1927.

*(Syllabus by Editorial Staff.)*

1. **Homicide** ⊸203(5)—**Deceased's statement en route that defendant shot her and she was going to die held dying declaration, though expressing desire to reach hospital.**

Statement of deceased, while on train en route to hospital, that she was shot to death by defendant, and that she was going to die, *held* admissible as dying declaration, though she later asked how long it would be "before we get over there."

2. **Criminal law** ⊸1064(5)—**Motion for new trial on ground that verdict is. contrary to law and evidence presents nothing for review.**

In prosecution for murder, motion for new trial, based solely on ground that verdict is contrary to law and evidence, presents nothing for review.

Appeal from Thirteenth Judicial District Court, Parish of St. Landry; B. H. Pavy, Judge.

William Rosette was convicted of murder, and he appeals. Affirmed.

A. V. Pavy, of Opelousas, for appellant.

Percy Saint, Atty. Gen., R. Lee Garland, Dist. Atty., of Opelousas, and E. R. Schowalter, Asst. Atty. Gen., for the State.

BRUNOT, J. The accused was indicted for murder. He was tried, and the jury returned the following verdict:

"We, the jury, find the prisoner at the bar, William Rosette, guilty without capital punishment."

From this verdict and a sentence of the court to life imprisonment, the defendant has appealed.

There are two bills of exception in the record.

### Bill No. 1.

[1] This bill was reserved to the admission in evidence of the dying declaration of the

deceased. The state proposed to prove a dying declaration made by the deceased to her mother while on a Texas & Pacific train, en route to the Charity Hospital at New Orleans. The testimony taken before the jury preliminary to the admission of the dying declaration of the deceased was reduced to writing and attached to the bill of exceptions. This testimony is as follows:

"Q. Did you see your daughter Octavia some time after the shooting?

"A. At my house; yes, sir.

"Q. Did you accompany her in person from Melville to the hospital?

"A. Yes, sir; I went with her.

"Q. How did they bring her, in the baggage car or passenger car?

"A. Baggage car.

"Q. Did she tell you anything about her condition, how she felt?

"A. She told me, 'Mama' she handed me her hand and I thought she wanted me to turn her over, and I handed her my hand, which she caught; she put her other arm around my neck, and then she said, 'Mama, I am shot to death, and I am going to die, and William Rosette shot me because I would not let him do what he wanted to do with me.' This was before we reached the Mississippi river; we were still in the baggage car.

"Q. You mean that was before you crossed the Atchafalaya river?

"A. No, sir; the Mississippi river.

"Q. The first time you testified you said it was before you left Melville?

"A. No. I did not say that; I said before we crossed the Mississippi river.

"Q. That was before you got to New Orleans?

"A. I do not know.

"Q. Who went with your daughter besides you?

"A. Me alone.

"Q. How many days did she live after that?

"A. She died the same day in Charity Hospital.

"Q. Was Dr. Morgan on the train with you?

"A. Dr. Morgan examined her in his office in Melville.

"Q. What time did you get in New Orleans?

"A. In the morning. I could not tell the time.

"Q. Was the train moving?

"A. It was moving, and she said: 'Mama, how long will it be before we get over there?' "

This answer is the basis of defendant's bill, and on this answer he argues that the declaration of the deceased was not made under the sense of impending dissolution, but that her inquiry as to "how long will it be before we get over there" was indicative of the deceased's hope of recovery under proper treatment.

The following questions and answers show that the deceased did not know where she was going:

"Q. Why did she ask you that question?
"A. I don't know; she did not say that.
."Q. But she said she wanted to go to the hospital?
"A. She did not say that; she just asked me, 'How long will it be before we get there?'
"Q. You had not reached the Mississippi river?
"A. No, sir; not yet.
"Q. How long was it before you reached the Mississippi river?
"A. Not yet.
"Q. Were you giving her any nourishment?
"A. I ask her, and she told me 'No.'
"Q. She knew you were going to the hospital in New Orleans?
"A. I don't know if she knew it or not.
"Q. Did she take any nourishment before you reached New Orleans?
"A. No, sir.
"Q. Why did you go in the baggage car?
"A. Because I wanted to be with her.
"Q. Did she ask you how long it will be before we get there?
"A. Yes; and that was the last question she asked me."

Under this proof the lower court held that the declaration of the deceased was admissible in evidence as a declaration made under the sense of impending dissolution.

The ruling was correct, and there is no merit in this bill. State v. Robertson, 162 La. 641, 110 So. 888.

### Bill No. 2.

[2] This bill was reserved to the overruling of a motion for a new trial. The motion alleges that the verdict rendered is contrary to the law and the evidence.

The per curiam of the trial judge is to the effect that the verdict was in strict accord with the law and the evidence; moreover, a motion for a new trial, based solely on the ground that a verdict is contrary to the law and the evidence, presents nothing for review.

For these reasons the judgment and sentence of the trial court are affirmed.